UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 AUG 16 PH 2: 46

CLERK

BY_____
DEPUTY CLERK

MICHAEL and NANCY VALENTE, on their )
own behalf and as next friend of their child )
Dominic; PAUL and INGRID GALLO, on their )
own behalf and as next friend of their child )
Lucy; JOANNA and STEPHEN BUCKLEY, )
on their own behalf and as next friend of their )
children Carter and Hudson, )
)
        Plaintiffs, )
)
v. )                    Case No. 2:20-cv-00135
)
DANIEL M. FRENCH, in his official capacity )
as Secretary of the Vermont Agency of )
Education and as a member of the Vermont )
State Board of Education; THE TWO RIVERS )
SUPERVISORY UNION; LAUREN )
FIERMAN, in her official capacity as )
Superintendent of the Two Rivers Supervisory )
Union; THE LUDLOW MOUNT HOLLY )
UNIFIED UNION SCHOOL DISTRICT; )
PAUL ORZECHOWSKI, in his official )
Capacity as Chair of the Ludlow Mount Holly )
Unified Union School District; THE GREATER )
RUTLAND SUPERVISORY UNION; )
CHRISTOPHER SELL, in his official capacity )
as the Superintendent of the Greater Rutland )
County Supervisory Union; THE RUTLAND )
TOWN SCHOOL DISTRICT; LYNETTE )
GALLIPO, in her official capacity as Chair of )
the Rutland Town School District Board; THE )
WINDSOR SOUTHEAST SUPERVISORY )
UNION; DAVID BAKER, in his official )
capacity as Superintendent of the Windsor )
Southeast Supervisory Union; THE )
HARTLAND SCHOOL DISTRICT; NICOLE )
BUCK, in her official capacity as Chair of the )
Hartland School District Board; JOHN )

CARROLL, in his official capacity as Chair of )
the Vermont State Board of Education; JENNA )
O'FARRELL, in her official capacity as Vice )
Chair of the Vermont State Board of Education; )
SABINA BROCHU, in her official capacity as )
a member of the Vermont State Board of )
Education; KIM GLEASON, in her official )
capacity as a member of the Vermont State )
Board of Education; KATHY LAVOIE, in her )
official capacity as a member of the Vermont )
State Board of Education; WILLIAM MATHIS,)
in his official capacity as a member of the )
Vermont State Board of Education; OLIVER )
OLSEN, in his official capacity as a member of )
the Vermont State Board of Education; PETER )
PELTZ, in his official capacity as member of )
the Vermont State Board of Education; )
ANGELITA PENA, in her official capacity as a )
member of the Vermont State Board of )
Education; JENNIFER DECK SAMUELSON, )
in her official capacity as a member of the )
Vermont State Board of Education, )
                                        )
        Defendants.                     )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART STATE DEFENDANT'S MOTION TO DISMISS AND GRANTING SCHOOL DEFENDANT'S MOTION TO DISMISS

(Docs. 42, 44)

Minor Plaintiff Dominic, his parents Michael and Nancy Valente, minor Plaintiff

Lucy, her parents Paul and Ingrid Gallo, and minor Plaintiffs Carter and Hudson and their

parents Joanna and Stephen Buckley (collectively, "Plaintiffs") bring this action against

Defendants Daniel M. French in his official capacity as Secretary of the Vermont Agency

of Education ("AOE") and as a member of the Vermont State Board of Education

("SBE"), The Two Rivers Supervisory Union ("TRSU") and its Superintendent, Lauren

Fierman, in her official capacity, The Ludlow Mount Holly Unified Union School

District ("LMHUUSD"), Paul Orzechowski in his official capacity as Chair of

LMHUUSD, The Greater Rutland Supervisory Union ("GRSU"), Christopher Sell in his

official capacity as the Superintendent of the GRSU, The Rutland Town School District ("RTSD"), Lynette Gallipo in her official capacity as Chair of RTSD, the Windsor Southeast Supervisory Union ("WSSU"), David Baker in his official capacity as Superintendent of the WSSU, The Hartland School District ("HSD"), Nicole Buck in her official capacity as Chair of the HSD Board, John Carroll in his official capacity as Chair of SBE, Jenna O'Farrell in her official capacity as Vice Chair of SBE, Sabina Brochu in her official capacity as a member of SBE, Kim Gleason in her official capacity as a member of SBE, Kathy Lavoie in her official capacity as a member of SBE, William Mathis in his official capacity as a member of SBE, Oliver Olsen in his official capacity as a member of SBE, Peter Peltz in his official capacity as a member of SBE, Angelita Pena in her official capacity as a member of SBE, and Jennifer Deck Samuelson in her official capacity as a member of SBE (collectively, the "Defendants"),[1] alleging that Defendants have a policy and practice of refusing to pay tuition to religious schools through the State of Vermont's statutory tuition program (the "Town Tuition Program").

## I.     Procedural Background.

On October 16, 2020, Defendants moved to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7) for lack of standing, failure to state a claim upon which relief can be granted, and failure to join an indispensable party (Docs. 42, 44.) In response, Plaintiffs moved to amend their Complaint. On February 5, 2021, the court granted Plaintiffs leave to amend.

On February 9, 2021, Plaintiffs filed their First Amended Complaint (the "FAC") alleging five claims: a violation of Plaintiffs' Free Exercise of Religion rights (Count I); a violation of the Establishment Clause of the First Amendment to the United States Constitution (Count II); a violation of Plaintiffs' Freedom of Speech rights (Count III); a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (Count IV); and a violation of Plaintiffs' substantive Due Process

---

[1] Defendant French and the members of the SBE are hereinafter referred to as the "State Defendants." The "School Defendants" refers to the School Districts, their Chairpersons, the Superintendents, and the Supervisory Unions.

rights (Count V). Plaintiffs seek declaratory and injunctive relief against all Defendants, as well as an award of compensatory or nominal damages from the School Defendants, attorney's fees, and costs. Defendants filed supplemental memoranda in support of their motions to dismiss on March 26 and 29, 2021, to which Plaintiffs responded. On April 30, 2021, oral argument was held at which time the court took the pending motions under advisement.

Plaintiffs are represented by David G. Hodges, Esq., Deborah T. Bucknam, Esq., Erica J. Smith, Esq., and Timothy D. Keller, Esq. The State Defendants are represented by Assistant Attorneys General Jon T. Alexander and Rachel E. Smith. The School Defendants are represented by William F. Ellis, Esq.

## II.    Constitutional and Statutory Framework.

### A.    Vermont's Town Tuition Program.

Vermont's Constitution provides:

> That all persons have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings, as in their opinion shall be regulated by the word of God; *and that no person ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of conscience[.]*

Vt. Const. ch. I, art. 3 (emphasis supplied). The latter clause is commonly referred to as the "Compelled Support Clause."

The "Town Tuition Program" is a Vermont statutory program that provides tuition to students who live in towns without public schools so that they can obtain a publicly funded education. Under Vermont law,

> (a) Each school district shall maintain one or more approved high schools in which high school education is provided for its resident students unless:
>
> (1) the electorate authorizes the school board to close an existing high school and to provide for the high school education of its students by paying tuition to a public high school, an approved independent high school, or an independent school meeting education quality standards, to be selected by the parents or guardians of the student, within or outside the State; or
>
> (2) the school district is organized to provide only elementary education for its students.

4

(b) For purposes of this section, a school district that is organized to provide kindergarten through grade 12 and maintains a program of education for only the first eight years of compulsory school attendance shall be obligated to pay tuition for its resident students for at least four additional years.

(c)(1) A school district may both maintain a high school and furnish high school education by paying tuition:

    (A)    to a public school as in the judgment of the school board may best serve the interests of the students; or

    (B)    to an approved independent school or an independent school meeting education quality standards if the school board judges that a student has unique educational needs that cannot be served within the district or at a nearby public school.

(2) The judgment of the [school] board shall be final in regard to the institution the students may attend at public cost.

16 V.S.A § 822.

### B.    The Role of the State Board of Education and School Boards.

The SBE hears appeals of tuition decisions made by each school district:

A school district shall not pay the tuition of a student except to a public school, an approved independent school, an independent school meeting education quality standards, a tutorial program approved by the State Board, an approved education program, or an independent school in another state or country approved under the laws of that state or country, nor shall payment of tuition on behalf of a person be denied on account of age. Unless otherwise provided, a person who is aggrieved by a decision of a school board relating to eligibility for tuition payments, the amount of tuition payable, or the school he or she may attend, may appeal to the State Board and its decision shall be final.

16 V.S.A. § 828. The SBE also determines which schools are "approved independent schools":

To become an approved independent school, the school must: (1) offer elementary or secondary education; (2) provide a prescribed minimum course of study; and (3) "substantially" comply with Vermont Board of Education rules for approved independent schools. 16 V.S.A. § 166(b). The rules must at a minimum require "that the school has the resources required to meet its stated objectives, including financial capacity, faculty who are qualified by training and experience in the areas in which they are assigned, and physical facilities and special services that are in accordance with any state or federal law or regulation." *Id.*

*Chittenden Town Sch. Dist. v. Dep't of Educ. (Chittenden Town)*, 738 A.2d 539, 545 (Vt. 1999) (footnote omitted).

### C. *Chittenden Town*'s Requirement of "Adequate Safeguards."

The Vermont Supreme Court has described the Town Tuition Program as "quite simple"; if a town school district "provides elementary education, it is required to provide secondary education." *Id.* at 544 (citing 16 V.S.A. § 822(a)). A town "has a number of options in meeting this obligation. The two main ones are to maintain a public high school or to pay tuition 'to an approved public or independent high school, to be selected by the parents or guardians of the pupil, within or without the state." *Id.* (footnote omitted) (quoting 16 V.S.A. § 822(a)-(b)).

"Neither the [Town Tuition Program] statute nor the rules deal with sectarian education[]" and "neither the statute nor the rules deal with the religious part of the curriculum of a sectarian school." *Id.* at 545. There is thus "no limit on the quantity and nature of sectarian subjects[,]" nor is there any requirement that "sectarian education be separated from secular education. It is [therefore] entirely possible that the majority of the education in an approved independent school will be in religious tenets and doctrine." *Id.* (footnote omitted). This lack of restraints on a publicly funded religious education prompted the Vermont Supreme Court to "consider the constitutional implications of the [Town Tuition Program] authorizing school districts to provide high school education to their students by paying tuition for nonpublic schools selected by their parents." *Id.* at 541 (citing 16 V.S.A. §§ 822, 824).

Having concluded in a prior case that "the Establishment Clause of the United States Constitution was not an impediment to the reimbursement at public expense of tuition paid to a sectarian school[,]" in *Chittenden Town*, the Vermont Supreme Court addressed "whether the tuition reimbursement scheme transgresses the Compelled Support Clause of the Vermont Constitution, Vt. Const. ch. I, art. 3, which speaks not to establishment of religion but to state support of religious worship." 738 A.2d at 541.

Holding "that a school district violates Chapter I, Article 3 [of Vermont's Constitution] when it reimburses tuition for a sectarian school under [16 V.S.A.] § 822 in

the absence of adequate safeguards against the use of such funds for religious worship[,]" *id.* at 541-42, the Vermont Supreme Court observed that "Article 3 is not offended . . . unless the compelled support is for the 'worship' itself." *Id.* at 550. As a result, the constitutional defect to be remedied in Vermont's Town Tuition Program is the absence of "restrictions that prevent the use of public money to fund religious education." *Id.* at 562 (observing the court saw "no way to separate religious instruction from religious worship").

To the extent that *Chittenden Town* may be misread as precluding all payments of public funds to religious schools, the Vermont Supreme Court specifically disavowed that interpretation:

> Because we have concluded that Chittenden's tuition payments to religious schools violate Article 3, [the Compelled Support Clause,] we must address plaintiff's additional contention that such an outcome violates the Free Exercise Clause of the First Amendment. It plainly does not. *The Free Exercise argument is premised on plaintiff's assumption that we would conclude that children who attend religious schools may not receive public educational funding, while children who attend public schools may. This is not our ruling. We have determined only that public funds may not pay for religious worship within the meaning of Article 3, wherever it occurs.*

*Id.* at 563 (emphasis supplied).

### D.     "Adequate Safeguards" Remains Undefined.

The Vermont Supreme Court acknowledged that "adequate safeguards" and "appropriate restrictions[]" could render publicly funded tuition payments to religious schools constitutionally permissible. *Id.* at 542, 564. It has cautioned that *Chittenden Town* is a "narrow ruling" whose "most critical lesson . . . is that the fact that the recipient of government support is a religious organization is not itself determinative[;] . . . whether the funds are used to support religious worship is the critical question." *Taylor v. Town of Cabot*, 2017 VT 92, ¶ 23, 205 Vt. 586, 597-98, 178 A.3d 313, 320 (observing that *Chittenden Town* does not prevent "children who attend religious schools" from "receiv[ing] public educational funding").

The Vermont Supreme Court has recognized that there are "myriad ways that a public school district can subsidize education in a religious school by paying for expenses

that occur whether or not the school was sectarian." *Chittenden Town*, 738 A.2d at 562 (footnote omitted). It, however, has never described those ways. In response to a certified question as to how "adequate safeguards" should be defined or determined, the Vermont Supreme Court has declined to answer, asserting that it requires a factual record which documents a school board's attempt to define that standard for itself. Because, in this case, the school boards did not attempt to do so, the Vermont Supreme Court declined to provide guidance as to how that task should be undertaken.

The AOE has similarly declined to provide guidance. On January 14, 2021, AOE promulgated nonmandatory "best practices" for school districts that pay tuition to approved independent schools but has since rescinded them. As a result, there is presently no definition of the term "adequate safeguards" as used in *Chittenden Town* and no guidance as to how that determination should be made.

Because Plaintiffs assert no facial challenge to the Compelled Support Clause of the Vermont Constitution, where possible, the court must harmonize the dictates of Vermont and federal law. *See Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 493 (1983) (holding that "[w]here fairly possible, courts should construe a statute to avoid a danger of unconstitutionality"); *Causeway Med. Suite v. Ieyoub*, 109 F.3d 1096, 1107 (5th Cir. 1997) (holding that when "consider[ing] the constitutionality of state [laws]," the court should be "mindful of the principle that [it] should avoid 'federal-court nullification of state law,'") (quoting *Leavitt v. Jane L.*, 518 U.S. 137, 145 (1996)). Federal law, however, remains the supreme law of the land. *See Testa v. Katt*, 330 U.S. 386, 391 (1947) (holding that "the Constitution and the laws passed pursuant to it are the supreme laws of the land").

## III. The FAC's Allegations.

### A. The Parties and Their Tuition Requests.

The school districts in which the Plaintiffs reside do not maintain a public high school and are therefore permitted to participate in the Town Tuition Program. Each of the schools that Plaintiffs attend meet the requirements to be an approved independent school under 16 V.S.A. § 166. Plaintiffs allege that students attending the schools are

nonetheless "ineligible to receive tuition payments based on religion." (Doc. 73 at 15-16, ¶¶ 73, 78.)

Dominic Valente and his parents Michael and Nancy Valente are residents of Mount Holly, Vermont, part of the LMHUUSD which is a member of the TRSU. Dominic attends Mount St. Joseph Academy, a Catholic school, "because of its high-quality academics, smaller class sizes, accessible sports programs, and its location near [the Valentes'] home." *Id.* at 5, ¶ 13. The Valentes requested tuition for Dominic to attend Mount St. Joseph Academy for the 2019-2020 school year but were informed by the superintendent of their school district that its "legal counsel [had] informed [them] that sending public funds to a religious school is a violation of Article 3 of the Vermont Constitution." (Doc. 73 at 19, ¶ 94.) The Valentes renewed their request for tuition for the 2020-2021 school year and their request was formally denied by their school district. As a result, the Valentes paid $6,500 for Dominic to attend Mount St. Joseph Academy in 2019 and 2020.

Lucy Gallo and her parents Paul and Ingrid Gallo live in Rutland Town, Vermont, part of the RTSD which is a member of the GRSU. The Gallos are Catholic, and Lucy attends Mount St. Joseph Academy "because the school's religious worldview aligns with [the Gallos'] sincerely held religious beliefs" and "because of its high-quality academics, traditional grading system, excellent sports programs, smaller class sizes, and to prepare [Lucy] for college." *Id.* at 6, ¶ 14. The Gallos requested tuition for Lucy to attend Mount St. Joseph Academy for the 2019-2020 school year. An official from RTSD asked for guidance from AOE, and an AOE official responded that "there is no change in a district's ability to pay tuition to a parochial school. The Chittenden decision still stands." (Doc. 73 at 20, ¶ 97.) RTSD subsequently denied the Gallos' request. The Gallos renewed their request for the 2020-2021 school year and were formally denied by their school district. As a result, the Gallos paid $6,500 for Lucy to attend Mount St. Joseph Academy in 2019 and 2020.

Carter and Hudson Buckley and their parents Steve and Joanna Buckley live in Hartland, Vermont, part of HSD which is a member of the WSSU. The Buckleys are

9

Catholic, and Carter and Hudson Buckley attend the New England Classical Academy
("NECA"), an independent Catholic school in Claremont, New Hampshire, "because the
school's religious worldview aligns with their sincerely held religious beliefs" and
"because of its high academic standards." *Id.* at 6, ¶ 15. The Buckleys requested tuition
for their sons to attend NECA for the 2019-2020 school year but were told by Defendant
David Baker that "the State Supreme Court ruled on the Constitutional prohibition of any
taxpayer money contributed to an independent school that is foundationally religious."
(Doc. 73 at 20, ¶ 99.) HSD's website also states that "[s]tudents may also attend any non-
religious private school and Hartland pays the tuition according to the statewide average,
with the child's family paying the remaining tuition balance." *Id.* at 20, ¶ 100. The
Buckleys renewed their request for the 2020-2021 school year and were formally denied
by HSD. As a result, the Buckleys paid $6,750 for each of their children to attend NECA
in 2019 and 2020.

### B.     The SBE's April 21, 2021 Decision.

Each Plaintiff appealed the denials of their 2020-2021 tuition requests to the SBE,
but at the time of the filing of the FAC, SBE had not yet issued a decision on any of the
appeals. On April 21, 2021, SBE decided Plaintiffs' appeals of the respective school
boards' tuition decisions for the 2020-2021 school year. (Doc. 85-1.) Because
LMHUUSD granted the Valentes' request for tuition upon reconsideration, SBE denied
their appeal as moot. It, however, granted the Gallos' and the Buckleys' appeals and
ordered their respective school districts to pay tuition to their chosen schools at the
allowable rate for the 2020-2021 school year. In rendering its decision, the SBE did not
define *Chittenden Town's* use of "adequate safeguards" but instead observed that
"[u]ltimately the courts will have to resolve whether the use restriction that *Chittenden*
requires can co-exist with First Amendment requirements." *Id.* at 21. The SBE explained
its rationale in relevant part as follows:

> [T]he limited record available to the Board shows only that the requests
> were denied by the school boards, upon the advice of counsel. The record
> does not establish that the tuition requests were denied because the schools
> at issue would use public funds for religious worship or instruction.

10

Nothing in the record suggests that the schools were asked whether they could certify that public tuition dollars would not be used to fund religious worship or religious instruction.

. . .

*Espinoza's* holding is clear: appellants cannot be excluded from access to tuition payments based solely on the religious affiliations of the schools their children attend. Much as the Second Circuit held in *A.H.*, the Board is unable to find in the record here a basis for the denial other than religious status.

In reaching this decision, the Board does not hold – nor could it – that the Vermont Supreme Court's interpretation of the Compelled Support Clause in *Chittenden* conflicts with *Espinoza*. *Chittenden* holds, in essence, that the Compelled Support Clause requires a use-based limitation on public tuition payments. It does not prohibit tuition payments to religious schools generally or to any category of religious schools. It only requires sufficient safeguards to ensure that public funds are not used to support religious worship or religious instruction. *Chittenden*, 169 Vt. at 344, 738 A.2d at 563; *Taylor*, 2017 VT 92, ¶ 23.

The problem here is that the record does not show that these tuition requests were denied because the schools at issue would have used public dollars to fund religious worship or religious instruction. The State Board assumes that the school boards were motivated by this concern in attempting to apply *Chittenden*. But *Espinoza* makes clear that religious status cannot be used as a stand-in for religious use. *See* 140 S. Ct. at 2256. "A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Id.* at 2261. Given the "strictest scrutiny" that *Espinoza* requires, the Board concludes that the tuition denials in the Gallo, Buckley, and Dunne appeals must be reversed, and the school districts ordered to make the tuition payments.

The Board is cognizant that school districts and local school boards have been placed in a difficult position with respect to tuition requests for religious schools. By statute, the districts must decide whether or not to grant a request for a particular school. The *Chittenden* ruling itself, however, left unclear what safeguards were necessary under the Vermont Constitution. The State did not adopt legislation or rules to implement *Chittenden* – either before or after the U.S. Supreme Court's decisions in *Trinity Lutheran* and *Espinoza*. Further, because the school boards issued no written decisions, and decided these requests on the advice of counsel provided in executive session, the State Board is effectively not privy to the reasoning underlying the boards' decisions. This decision is thus narrow

and its language carefully chosen: the State Board is unable to conclude on this limited record that the tuition denials satisfied the First Amendment standards set forth in *Trinity Lutheran* and *Espinoza*.

(Doc. 85-1 at 18-19) (footnotes omitted).

## C. The Role of the State Defendants.

Under Vermont law, Defendant French's duties include "[s]upervis[ing] and direct[ing] the execution of the laws relating to the public schools and ensur[ing] compliance." 16 V.S.A. § 212(5). Plaintiffs allege that the AOE has the authority to withhold a school district's funding if the district violates the requirements of law pursuant to 16 V.S.A. § 4003(a) which states that "[n]o school district shall receive any aid under this chapter unless that school district complies with the provisions of law relative to teachers' salaries, appointment of superintendents, detailed financial reports to the Agency, and any other requirements of law." Plaintiff alleges that the SBE:

is responsible for the establishment, advancement, and evaluation of public education policy. The powers and duties of the Board include making regulations governing: attendance and records of attendance of all pupils, standards for student performance, adult basic education programs, approval of independent schools, disbursement of funds, and equal access for all Vermont students to a quality education.

(Doc. 73 at 11, ¶ 42.)

Plaintiffs contend that "State Defendants have a policy and practice of advising, informing, instructing, and directing the School Defendants that they may not pay tuition for residents' students to attend schools that offer religious worship and instruction or are otherwise deemed too religious," *id.* at 21, ¶ 107, and that this policy has "a determinative and coercive effect on the School Defendants' decision making." *Id.* at 21, ¶ 104. They note that, "[i]n the past, the [AOE] has withheld state funding to at least one school district that paid tuition to schools deemed 'sectarian[,]'" *id.* at 7, ¶ 19, and that Defendant French has previously stated that "[i]n order to be an approved independent school [under the Town Tuition Program], the school must be: 1) non-sectarian, and 2) maintain an accredited curriculum." *Id.* at 18, ¶ 88. In December 2019, an AOE official stated that "public tuition can be paid to approved, non-sectarian independent schools."

*Id.* at 18, ¶ 89. Plaintiffs contend that "State Defendants have not taken appropriate steps to prevent school districts from discriminating against religion in the Town Tuition Program[.]" *Id.* at 22, ¶ 109. They maintain that the State Defendants have failed to develop the "adequate safeguards" required to ensure that public funds do not pay for religious worship under *Chittenden Town*.

### D. The Role of the Supervisory Union Defendants.

Vermont's Town Tuition Program creates no specific role for Supervisory Unions in addressing tuition requests. The Superintendents of each of the Supervisory Unions, however, are "the chief executive officer for the supervisory union board and for each school [district] board within the supervisory union[.]" 16 V.S.A. § 242. Plaintiffs have named each of these individuals as a defendant as well as their respective school districts. Plaintiffs nonetheless assert that each Supervisory Union Defendant "is obligated to enforce the legal and regulatory requirements for Vermont's tuition-payment system within its jurisdiction and is obligated to exercise its authority and powers in accordance with the U.S. Constitution." (Doc. 73 at 7-8, 10, ¶¶ 22, 29, 36.) Plaintiffs admit, however, that only the School District Defendants are "financially responsible for providing the Tuition Benefit for children who live within [their] district[s.]" *Id.* at 8-10, ¶¶ 26, 33, 40.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (internal quotation marks and citation omitted).

To survive a motion to dismiss, the FAC "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The sufficiency of a complaint is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.*

The court does not "weigh the evidence" nor "evaluate the likelihood" that a plaintiff will prevail on his or her claims. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017). "When considering a motion to dismiss pursuant to Rule 12(b)(6), the district court . . . is required to accept as true the facts alleged in the complaint, consider those facts in the light most favorable to the plaintiff, and determine whether the complaint sets forth a plausible basis for relief." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015).

## B.    Whether Plaintiffs Have Standing to Sue the State Defendants.

"Standing is a federal jurisdictional question 'determining the power of the court to entertain the suit.'" *Carver v. City of N.Y.*, 621 F.3d 221, 225 (2d Cir. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical[.] Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

14

*Id.* at 560-61 (internal quotation marks, citations, alterations, and footnote omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements[.]" *Id.* at 561 (internal citation omitted).

The State Defendants do not dispute that Plaintiffs have plausibly pled an injury in fact, but contend that Plaintiffs do not have standing because they fail to allege either causation or redressability against both Defendant French and the SBE. Plaintiffs admit that it is not the State Defendants, but rather the School Districts, who are "financially responsible for providing the Tuition Benefit for children who live within [their] district[s.]" (Doc. 73 at 8-10, ¶¶ 26, 33, 40.) As the Vermont Supreme Court has explained:

 [a]lthough the relevant statutes allow school districts to pay tuition on behalf of a resident who is a student in any approved private school, the *districts* must determine whether such a payment violates the Establishment Clause. *This responsibility rests upon them*, and not the State Board, except as a matter of appellate review.

*Campbell v. Manchester Bd. of Sch. Dirs.*, 641 A.2d 352, 356 (Vt. 1994) (emphasis supplied). Notwithstanding this clear mandate, Plaintiffs maintain that the State Defendants caused an injury by "maintain[ing] a policy and practice to instruct the School Defendants not to grant [tuition] requests when the religious school provide[s] religious worship and teachings." (Doc. 82 at 2.)

"[T]he 'case or controversy' limitation of Art. III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party[.]" *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). "[I]ndirectness of injury, while not necessarily fatal to standing, may make it substantially more difficult to meet the minimum requirement of Art. III: To establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id.* at 44-45 (internal quotation marks omitted). This is because the Supreme Court has "refus[ed] to endorse standing theories that rest on speculation about the

15

decisions of independent actors[.]" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (internal quotation marks and citation omitted).

However, "[w]hile . . . it does not suffice if the injury complained of is the result of the *independent* action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (internal quotation marks, alterations, and citations omitted) (emphasis in original); *see also Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55-56 (2d Cir. 2016) (holding that "[a] defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing"). At the pleading stage, this is not "an onerous standard[,]" *id.* at 55, but is instead a "relatively modest" burden to meet. *Bennett*, 520 U.S. at 171.

Where, as here, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction[,]" and it is "the burden of the plaintiff to adduce facts showing that [the choices of the third party] have been or will be made in such manner as to produce causation and permit redressability of injury[.]" *Lujan*, 504 U.S. at 562 (internal quotation marks and citations omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" because "on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* at 561 (internal quotation marks, citation, and alteration omitted).

Plaintiffs assert that the State Defendants have "a policy and practice of advising, informing, instructing, and directing School Defendants that they may not pay tuition for residents' students to attend schools that offer religious worship and instruction or are otherwise deemed too religious[.]" (Doc. 73 at 21, ¶ 107.)[2] Plaintiffs allege two instances

---

[2] In Plaintiffs' initial opposition to the State Defendants' motion to dismiss, they maintained that "State Defendants caused an injury by refusing to enforce the federal constitution's

16

in which AOE officials have indicated, albeit not directly to the School Defendants, that public funds are not available to fund tuition at "sectarian" schools. They further allege that this policy "has a determinative and coercive effect on the School Defendants' decision making" and that "[b]ut for" this policy, "Plaintiffs' respective school districts would have paid tuition at their respective religious schools." *Id.* at 21, ¶¶ 104, 108. Plaintiffs' theory of standing is more than mere speculation because it "relies . . . on the predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 139 S. Ct. at 2566; *see also Dennis v. JP Morgan Chase & Co.*, 343 F. Supp. 3d 122, 156 (S.D.N.Y. 2018) (observing that "the standard for Article III standing is not whether [] the alleged injury is *plausibly* fairly traceable, but, rather, whether the injury is *possibly* fairly traceable") (emphasis in original).

The State Defendants argue that Plaintiffs' claims of standing "are belied by [their] evidence and other allegations" because Plaintiffs conceded that the AOE refused to provide guidance to the School Defendants regarding Plaintiffs' 2020-2021 tuition requests and because the School Defendants denied Plaintiffs' tuition requests on the advice of their counsel. (Doc. 77 at 8.) However, "[t]o the degree that defendants challenge the factual underpinnings of the allegations made by plaintiffs in support of their standing to bring suit, the argument is premature." *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 361 (2d Cir. 2003). "Defendants may certainly test [Plaintiffs'] standing as the litigation progresses by requesting an

---

antidiscrimination requirements among the school districts that they oversee." (Doc. 55 at 3.) To the extent that Plaintiffs argue that they have standing because "[i]t is State Defendants' responsibility to establish the state's education policy" and the State Defendants have not "withh[e]ld funds from school districts that defy that policy[,]" such a theory of causation must fail. *Id.* at 4. The State Defendants' general authority over education is insufficient, without more, to establish traceability. *See Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (holding that "[i]n the absence of any evidence that the Secretary controls ballot order, the voters and organizations likewise cannot rely on the Secretary's general election authority to establish traceability").

evidentiary hearing or by challenging [Plaintiffs'] standing on summary judgment or even at trial." *Baur v. Veneman*, 352 F.3d 625, 642 (2d Cir. 2003).[3]

The allegations in the FAC, taken as true, plausibly allege that the State Defendants have contributed to Plaintiffs' injuries by providing guidance that, in turn, caused the School Defendants to reject their tuition requests, and Plaintiffs plausibly allege that, but for the State Defendants' policy, the School Defendants would have granted their tuition requests. It is therefore plausible that injunctive relief would redress Plaintiffs' harm. At this stage, plausibility is all that is required. *See Alliant Energy Corp. v. Bie*, 277 F.3d 916, 920 (7th Cir. 2002) (holding that "[i]t is easy to imagine facts *consistent with* this complaint and affidavits that will show plaintiffs' standing, and no more is required") (emphasis in original). The State Defendants' motion to dismiss for lack of standing is therefore DENIED.

## C.     Whether Plaintiffs Have Standing to Sue the Supervisory Union Defendants.

The School Defendants contend that Plaintiffs lack standing to sue the three Supervisory Union Defendants because Plaintiffs fail to allege causation or redressability against them. The Supervisory Union Defendants point out that the FAC contains no allegations regarding their role in the tuition process and that Plaintiffs acknowledge that it is the School Districts, who are members of the Supervisory Unions, rather than the Supervisory Unions themselves, who are financially responsible for providing the tuition benefit for children residing within their districts. It is also the School District Defendants, not the Supervisory Unions, who "must determine whether such a payment

---

[3] The State Defendants argued in their original motion to dismiss that Plaintiffs' claims were unripe because they had not yet received final decisions from the school districts. At the hearing, the State Defendants conceded that there is no longer a ripeness issue, but argued that Plaintiffs' claims are moot because the SBE granted their appeals for tuition for the 2020-2021 school year. Because Plaintiffs allege that the State Defendants have a long-standing policy and practice of instructing the School Defendants to deny tuition requests to religious schools and because Plaintiffs' requests for tuition for the 2019-2020 school year were denied, the court may still provide effective relief and the case is not moot. *See Calderon v. Moore*, 518 U.S. 149, 150 (1996) (holding the "even the availability of a partial remedy is sufficient to prevent a case from being moot") (internal quotation marks, alteration, and citation omitted).

violates the Establishment Clause[,]" *Campbell*, 641 A.2d at 356, and their judgment "shall be final in regard to the institution the students may attend at public cost." 16 V.S.A. § 822(c)(2).

Plaintiffs contend that "even if there were a statute making clear that the [Supervisory U]nions lack the power to determine tuition requests, this is irrelevant" because "the [S]upervisory [U]nions *did* play a role in making these determinations[.]" (Doc. 83 at 4) (emphasis in original). Plaintiffs do not, however, assert these same allegations in their FAC. Instead, Plaintiffs only allege that they "asked their *school districts* . . . to pay the tuition at their respective religious schools" and that their tuition requests were rejected by their school districts, including by the Superintendents of the Supervisory Unions who acted as chief executive officers of their respective school district boards and who are also named as Defendants. (Doc. 73 at 19, ¶ 93) (emphasis supplied). To the extent Plaintiffs allege that a Superintendent played a role in the decision-making, they allege no similar role by the Supervisory Union.[4]

Because Plaintiffs do not plausibly allege that the Supervisory Unions, as opposed to their Superintendents and member School Districts, played any role in the tuition decisions which caused their injuries, they lack standing to sue these entities. The School Defendants' motion to dismiss TRSU, GRCSU, and WSSU is therefore GRANTED.

---

[4] The Valentes allege that the denial of their 2019-2020 tuition request was transmitted "in an e-mail from the superintendent of their school district" and that their subsequent request for the 2020-2021 academic year was "formally rejected by their school district." (Doc. 73 at 19, ¶¶ 94, 95.) Similarly, the Buckleys allege that their 2019-2020 tuition request was rejected by Defendant David Baker, who is the Superintendent of WSSU as well as the chief executive officer of HSD, and that their request for the 2020-2021 school year was also "formally rejected by their school district." (Doc. 73 at 21, ¶ 101.) Only the Gallos allege that their request for tuition for the 2019-2020 school year was denied by "Defendant Rutland Supervisory Union[,]" but this allegation conflicts with their assertion that they requested tuition "from their school district[.]" *Id.* at 19-20, ¶ 97. *See In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 671 (S.D.N.Y. 2018) (holding that "the [c]ourt is not obliged to reconcile and accept as true pleadings that are contradicted by other matters asserted or relied upon") (internal quotation marks and citation omitted).

### D.    Whether the State Defendants are Protected by Sovereign Immunity.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "The Supreme Court has consistently held that the federal courts lack jurisdiction not only over suits against a state brought by citizens of other states, as the literal language of the Amendment provides, but also over suits against such states brought by their own citizens." *Dwyer v. Regan*, 777 F.2d 825, 835 (2d Cir. 1985). "An action against a state official in his official capacity is deemed an action against the state itself, which possesses sovereign immunity under the Eleventh Amendment[.]" *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020) (internal citations omitted).

"The Court has recognized an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). This is because "the officer is simply prohibited from doing an act which he had no legal right to do." *Ex Parte Young*, 209 U.S. 123, 159 (1908). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)); *see also In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (holding that "[a] plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that his complaint (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective") (internal quotation marks and citation omitted).

Defendants contend that the *Ex Parte Young* exception does not apply because "th[e] exception under *Ex parte Young* only applies where the official sued has 'some

connection with the enforcement of the [allegedly unconstitutional act].'" *Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 68 (E.D.N.Y. 2018) (quoting *Kuck v. Danaher*, 822 F. Supp. 2d 109, 141 (D. Conn. 2011)) (alterations in original) (footnotes omitted). The State Defendants correctly point out that a state official's general duty to enforce state laws is insufficient to establish the requisite connection. *See id.* at 69 (observing that "courts in the Second Circuit have not extended the exception under *Ex parte Young* on the basis that a state official has a general duty to execute and enforce state laws") (internal quotation marks and citations omitted); *see also McCluskey v. Comm'r of Nassau Cnty. Dep't of Soc. Servs.*, 2013 WL 4780954, at *8 (E.D.N.Y. Sept. 5, 2013) (holding that "[w]hile plaintiff has stated that the [state official] is responsible for the overall operation of [the state agency], this allegation, standing alone, is insufficient to demonstrate that the [state official] had a direct connection to, or responsibility for, the alleged illegal action") (internal quotation marks, alteration, and citation omitted).

In this case, Plaintiffs allege that Defendant French is "empowered to '[s]upervise and direct the execution of the laws relating to the public schools and ensure compliance.'" (Doc. 73 at 6, ¶ 16) (quoting 16 V.S.A. § 212). Plaintiffs further allege that the State Defendants have a policy and practice of advising and directing the School Defendants to deny tuition requests to attend religious schools. They claim that this policy has coerced the School Defendants' decisions to deny their tuition requests at religious schools, and they seek injunctive relief prohibiting the State Defendants from enforcing this alleged policy. These facts, taken as true, are sufficient to allege "some connection with the enforcement" of the policy beyond the State Defendants' general duty to enforce state law. *Ex Parte Young*, 209 U.S. at 157. The State Defendants' motion to dismiss based on sovereign immunity is therefore DENIED.

## E.    Whether Plaintiffs Plausibly Plead A Free Exercise Claim.

The Free Exercise Clause "protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status." *Trinity Lutheran Church of Columbia, Inc. v. Comer*

21

(*Trinity Lutheran*), 137 S. Ct. 2012, 2019 (2017) (alteration, internal quotation marks, and citation omitted). The State Defendants argue that Plaintiffs have failed to plausibly allege that they exercise their religion by sending their children to a religious school or that their religious exercise is being burdened by the State Defendants' actions.

"To have standing to pursue a claimed violation of the Free Exercise Clause, a plaintiff must allege that her own 'particular religious freedoms are infringed.'" *Altman v. Bedford Cent. Sch. Dist.*, 245 F. 3d 49, 71 (2d Cir. 2001) (quoting *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 224 n.9 (1963)); *see also McGowan v. State of Md.*, 366 U.S. 420, 429 (1961) (holding that appellants had "no standing to raise" Free Exercise claims where they "allege only economic injury to themselves; they do not allege any infringement of their own religious freedoms[,]" and "the record is silent as to what appellants' religious beliefs are"). "A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes upon his or her sincerely-held religious beliefs." *Jackson v. Boucaud*, 2009 WL 6066799, at *5 (N.D.N.Y. Dec. 31, 2009).

In the FAC, the Buckleys and the Gallos allege that they are members of the Catholic faith, and that they chose their respective religious schools at least in part because "the school's religious worldview aligns with their sincerely held religious beliefs." (Doc. 73 at 6, ¶¶ 14-15.) The FAC further alleges that it is their "conviction [] to educate their child in a religious school." *Id.* at 23, ¶ 120. Because the Buckleys and Gallos have "identif[ied] [their] religion [and] explain[ed] the role of [the conduct at issue] in [their] religion," the State Defendants' motion to dismiss their Free Exercise claims is DENIED. *Meadows v. Lesh*, 2010 WL 3730105, at *3 (W.D.N.Y. Sept. 17, 2010).

With regard to the Valentes, however, Plaintiffs have not alleged that they send their child to a Catholic school in furtherance of their religious beliefs. Rather, they allege that they send their child to Mount St. Joseph Academy "because of its high-quality academics, smaller class sizes, accessible sports programs, and its location near their home." (Doc. 73 at 5, ¶ 13.) These allegations will not suffice for a Free Exercise claim.

*See Harris v. McRae*, 448 U.S. 297, 320 (1980) (holding that plaintiffs "lack[ed] standing to challenge the Hyde Amendment on free exercise grounds because none alleged, much less proved, that she sought an abortion under compulsion of religious belief") (citing *McGowan*, 366 U.S. at 429); *Boucaud*, 2009 WL 6066799, at *6 n.12 (denying plaintiff's free exercise claim where he "d[id] not specify his religion or the religious beliefs that he claim[ed] were interfered with through defendants' conduct"). Because the Valentes fail to "assert sufficient allegations necessary to establish that [their] claim is based upon a sincerely held religious belief[,]" the State Defendants' motion to dismiss the Valentes' Free Exercise claims is GRANTED. *Meadows*, 2010 WL 3730105, at *3.

### F.    Whether Plaintiffs Plausibly Plead an Establishment Clause Claim.

The State Defendants contend that Plaintiffs fail to establish an injury cognizable under the Establishment Clause because Plaintiffs do not plausibly plead the State Defendants' intent to establish a religion. Plaintiffs respond that Defendants' establishment of a practice that is allegedly hostile to religion is sufficient.

"[T]he requirements for standing to challenge state action under the Establishment Clause, unlike those relating to the Free Exercise Clause, do not include proof that particular religious freedoms are infringed." *Schempp*, 374 U.S. at 224 n.9. Instead, the Establishment Clause "is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce non-observing individuals or not." *Id.* at 222. "[S]tanding to assert an Establishment Clause claim may rest either on the plaintiff's direct exposure to the challenged activity, or, in certain situations, on the plaintiff's status as a taxpayer[.]" *Altman*, 245 F.3d at 72 (internal citation omitted).

In their FAC, Plaintiffs maintain that the State Defendants' alleged policy of "denying tuition-eligible families religious options at schools that offer religious worship or instruction or [are] otherwise deemed too religious" is "hostile toward and disapproving of religion." (Doc. 73 at 25, ¶ 132.) Plaintiffs further assert that "[i]t would also be unconstitutionally intrusive for Defendants to try to tease out what aspects of a religious school are religious and what aspects of a religious school are secular[,]" although they do not allege that the State Defendants have made any such attempt. *Id.* at

23

133. These claims sound in the Free Exercise Clause, not in the Establishment Clause. "[A]lthough 'Establishment Clause cases . . . have often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general,' it is the 'Free Exercise Clause [that] is dispositive' when what is at issue is not a 'government effort[] to benefit religion or particular religions' but rather 'an attempt to disfavor . . . religion[.]'" *Carson ex rel O.C. v. Makin*, 979 F.3d 21, 48 (1st Cir. 2020) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993)) (alterations in original).

To the extent that Plaintiffs allege that the State Defendants' policy supports secularism, "[t]here is *no* relevant precedent for using [the Establishment Clause's] negative prohibition as a basis for extending the right of a religiously affiliated group to secure state subsidies." *Strout v. Albanese*, 178 F.3d 57, 64 (1st Cir. 1999) (emphasis in original). To hold that the State Defendants' actions were violative of both the Free Exercise Clause and the Establishment Clause would eliminate the "room for play in the joints productive of a benevolent neutrality" that exists between "those accommodations forbidden by the Establishment Clause and those mandated by the Free Exercise Clause[.]" *Young Advocs. for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 228 (E.D.N.Y. 2019) (quoting *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 669 (1970)). The State Defendants' motion to dismiss Plaintiffs' Establishment Clause claims is therefore GRANTED.

### G. Whether Plaintiffs Plausibly Plead a Free Speech Claim.

The State Defendants argue that Plaintiffs fail to state a Free Speech claim under the First Amendment because they do not plausibly allege their conduct is expressive or that the Town Tuition Program is a forum for speech. Plaintiffs do not dispute that the Town Tuition Program is not a forum for speech but argue that their decision to send their children to religious schools is constitutionally protected expressive conduct and protected expressive association.

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech[.]" U.S. Const. amend. I.

24

"It is well established that the First Amendment affords protection to symbolic or expressive conduct as well as to actual speech." *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) (internal quotation marks and citation omitted). However, "the fact that something is in some way communicative does not automatically afford it constitutional protection." *Zalewska v. Cnty. of Sullivan, New York*, 316 F.3d 314, 319 (2d Cir. 2003); *see also United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.").

"In determining whether particular conduct is sufficiently expressive to implicate the First Amendment, . . . the test is whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Kerik*, 356 F.3d at 205 (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). "The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies, and that party must advance more than a mere plausible contention that its conduct is expressive." *Id.* (internal quotation marks, citation, and footnote omitted).

Plaintiffs contend in their briefing that their choice of school "communicates . . . (1) the rejection of other educational philosophies or approaches, and (2) a commitment to the specific missions of the schools selected[,]" however, they do not allege those same facts in the FAC. (Doc. 55 at 18.) Moreover, activities are not "protected by the First Amendment simply because the organization earnestly believes those activities are important." *United States v. Thompson*, 896 F.3d 155, 165 (2d Cir. 2018) (footnote omitted).

Because Plaintiffs fail to allege that their attendance at religiously affiliated schools is intended to convey a particularized message, the FAC does not plausibly plead that they have engaged in expressive conduct protected by the Free Speech Clause of the First Amendment. *See Zalewska*, 316 F.3d at 319-20 (holding that plaintiff's wearing a skirt was not speech because "the message that [she] intends to convey is not a specific,

particularized message, but rather a broad statement of cultural values" and "it is difficult to see how [plaintiff's] broad message would be readily understood by those viewing her since no particularized communication can be divined simply from a woman wearing a skirt").

Plaintiffs' expressive association claim fares no better because they have likewise failed to allege that they associate with their chosen schools for any expressive purpose. "[I]mplicit in the right to engage in activities protected by the First Amendment is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'" *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). "To come within [the First Amendment's] ambit, a group must engage in some form of expression, whether it be public or private." *Id.* at 648. "In other words, in order for Plaintiffs to make out an expressive association claim, they must plead facts demonstrating that Plaintiffs and [their schools] associated to advance" a particularized message. *Singer v. City of New York*, 417 F. Supp. 3d 297, 318 (S.D.N.Y. 2019). They have not done so. "When . . . an individual engages in conduct that does not manifest an 'intent to convey a particularized message,' the [Free Speech Clause of the] First Amendment does not come 'into play.'" *Thompson*, 896 F.3d at 164 (quoting *Johnson*, 491 U.S. at 404). For this reason, the State Defendants' motion to dismiss Plaintiffs' Free Speech claims is GRANTED.

## H.   Whether Plaintiffs Plausibly Plead an Equal Protection Claim.

"The Equal Protection Clause [of the Fourteenth Amendment] requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "To prove a violation of the Equal Protection Clause, . . . a plaintiff must demonstrate that he was treated differently than others similarly situated

as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).

"To maintain an equal protection claim, plaintiffs [are] required to show 'adverse treatment of individuals compared with other similarly situated individuals [and that] such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Miner v. Clinton Cnty., N.Y.*, 541 F.3d 464, 474 (2d Cir. 2008) (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005)) (second alteration in original).

"To state a claim for an equal protection violation, [plaintiffs] must allege that a government actor intentionally discriminated against them" by showing either (1) "a law or policy is discriminatory on its face" because it "expressly classifies persons on the basis of" a protected classification; (2) "a law which is facially neutral . . . is applied in a discriminatory fashion"; or (3) "a facially neutral statute . . . was motivated by discriminatory animus and its application results in a discriminatory effect." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999). The State Defendants contend that Plaintiffs have not alleged that any government actor was aware of their religion or intentionally discriminated against them based on their faith. In the FAC, Plaintiffs assert that "[b]y denying tuition-eligible families religious educational options while allowing private non-sectarian options, Defendants' policy and practice discriminates, facially and as applied to Plaintiffs, on the basis of religion." (Doc. 73 at 27.)

A plaintiff may allege a prima facie intentional discrimination claim by "plead[ing] the existence of a similarly situated group that was treated differently." *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001) (citations and internal quotation marks omitted). Although their allegations are relatively cursory, Plaintiffs have alleged that Defendants have a policy of treating them disparately from parents who send their children to non-religious independent schools. Because Plaintiffs plausibly plead that the State Defendants' alleged policy is discriminatory on its face, the State Defendants' motion to dismiss Plaintiffs' Equal Protection claims is DENIED.

27

## I.   Whether Plaintiffs Plausibly Plead a Substantive Due Process Claim.

To establish a substantive due process violation, a plaintiff must allege a valid liberty or property interest and that the "defendants infringed that [] interest in an arbitrary or irrational manner." *Harlen*, 273 F.3d at 503. It is well-established that parents have a liberty interest in "direct[ing] the upbringing and education of children under their control." *Pierce v. Soc'y of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534-35 (1925). The Second Circuit has recognized that *Pierce* established "a parental right to send . . . children to a particular private school rather than a public school." *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003) (internal quotation marks omitted) (alteration in original). However, "showing the existence (and even the infringement) of a right is not sufficient to merit success on a substantive due process claim; Plaintiffs must also show that Defendant infringed on that right in an arbitrary manner." *Ass'n of Jewish Camp Operators v. Cuomo*, 470 F. Supp. 3d 197, 226 (N.D.N.Y. 2020). This is because "[s]ubstantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.'" *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995) (quoting *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994)).

Plaintiffs' substantive due process claims cannot proceed because "what would serve to raise [State Defendants'] actions beyond the wrongful to the unconscionable and shocking are facts which, if proven, would constitute, in themselves, specific constitutional violations." *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005). "[W]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." *Kia P. v. McIntyre*, 235 F.3d 749, 757-58 (2d Cir. 2000) (alteration in original) (internal quotation marks omitted).

Because Plaintiffs' substantive due process claims are "subsumed in [their] more particularized allegations" of Free Exercise and Equal Protection violations, the State Defendants' motion to dismiss Plaintiffs' substantive due process claims is GRANTED.

*Velez*, 401 F.3d at 94; *see also Albright v. Oliver*, 510 U.S. 266, 273 (1994) (observing that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims") (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART the State Defendants' motion to dismiss (Doc. 42), and GRANTS the School Defendants' motion to dismiss the Supervisory Union Defendants (Doc. 44).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _16th_ day of August, 2021.

Christina Reiss, District Judge
United States District Court